# *United States District Court*

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

LAWRENCE LONDON, and
WILLIAM T. MOCCIA A/K/A "BILLY"

**CRIMINAL COMPLAINT**

CASE NUMBER: 00-4092-SNOW

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __April 23, 2000__ in __Broward__ county, in the __Southern__ District of __Florida__ and elsewhere, the defendants knowingly and intentionally conspired to import and to possess with the intent to distribute a Schedule II controlled substance, that is, marijuana; knowingly and intentionally imported a Schedule II controlled substance, that is, marijuana; and knowingly and intentionally possessed with the intent to distribute a Schedule II controlled substance, that is, marijuana;

in violation of Title __21__ United States Code, Section(s) __841(a)(1), 846, 952(a)(1), 963__

I further state that I am a(n) __Special Agent__ and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached and made a part hereof: [x] Yes [ ] No

Thomas J. Redpath, Special Agent
Drug Enforcement Administration

Sworn to before me, and subscribed in my presence,

May 1, 2000         at   Ft. Lauderdale, FL
Date                     City and State

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT

I, Thomas J. Redpath, having first been duly sworn, do hereby state and depose the following:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been so employed since 1996. Prior to that I was a law enforcement officer for the Pompano Beach, Broward County, Florida Police Department for approximately six years. Throughout my career in law enforcement, I have received hundreds of hours of training in drug interdiction, including training in drug identification, testing, manufacturing, pricing, concealment, importation and distribution of narcotics. The information in this affidavit is based on my personal knowledge and that of other law enforcement officers and agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause for arrests in this case, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause for the arrests in this case.

2. On or about April 24, 2000, the United States Coast Guard discovered approximately ten bales of what appeared to them to be marijuana, weighing approximately 413 pounds, floating in the Atlantic Ocean. The suspected marijuana was discovered at the coordinates of 26 degrees by 11 minutes north and 79 degrees by 59 minutes west. The substance field tested positive for the presence of THC.

3. On or about April 25, 2000, a special agent employed by DEA received a telephone call from an anonymous source asking whether they were aware of the Coast Guard's marijuana seizure. The anonymous source went on to say that he had called about a week prior to advise

1

DEA that marijuana was going to be air dropped and that the Coast Guard's seizure was part of that air drop. The anonymous source stated that approximately seven to eight hundred pounds of the air dropped marijuana was located at 2371 NE 23rd Court, Pompano Beach, Florida. The anonymous source advised that this was a yellow house, which had a white garage door, a blue car and a sailboat in the back. The anonymous source further advised that his sources indicated that the marijuana was going to be moved shortly.

4. On or about April 25, 2000, Detective Andy Weiman, of the Broward Sheriff's Office, determined that 2371 NE 23rd Court, Pompano Beach, was not a valid address. However, Detective Weiman discovered an address of 2731 NE 23rd Court, Pompano Beach, Florida, Broward County, which was a yellow house, with a white garage, with a red car in the front and a sailboat in the back. Detective Weiman is also canine officer and works with a dog trained to detect the odor of controlled substances. Detective Weiman "ran" his dog around 2731 NE 23rd Court, and the dog alerted to the presence of the odor of a controlled substance outside the garage door.

5. Detective Weiman knocked on the door, which was answered by Lance Myers. Detective Weiman identified himself and the purpose of his visit. Lance Meyers and Detective Weiman were discussing certain matters, whereupon Terrill Myers, Lance's father and the owner of the house at 2731 NE 23rd Court, arrived. Terrill Myers consented to a search of his house.

6. In the garage at 2731 NE 23rd Court, DEA agents discovered a 1988 Blue Hyundai, which is owned by Terrill Myers. Terrill Meyers consented to a search of his vehicle, and directed the agents to the keys to his car. The agents discovered approximately 117 pounds of what appeared to be marijuana in the trunk of the car. The substance field tested positive for the

2

presence of THC.

7. After being advised of his rights against self incrimination, Erik Johnson, who was present in Meyers' house, advised that about two and half weeks prior, he was contacted by Greg Pillock regarding the air drop. Pillock inquired as to whether Johnson knew anyone with a boat. About two days after that, Johnson contacted his friend, Lance Meyers, who advised that his father, Terrill Myers, owned a boat. About two days after that Johnson spoke with Terrill Meyers about using his boat in the air drop operation. About three days after that, Pillock, Terrill Meyers and Johnson met to discuss the details of the drop. According to Johnson, Pillock advised them that the marijuana was to be dropped off from an airplane at predetermined coordinates, which he could not recall. Johnson further stated that on April 16, 2000, Meyers and he executed a dry run of the operation wherein they approached the given coordinates at 4 p.m. An airplane flew overhead and radioed them, inquiring "Gizmo, how's the fishing?" They responded, and the plane continued to fly overhead.

Johnson stated that on April 23, 2000, at about 9 p.m., Meyers and he proceeded to the agreed upon coordinates. At about 11 p.m., they saw a plane flying overhead. The captain radioed them, inquiring, "Gizmo, how's the fishing?" They responded, whereupon four large cubes of marijuana were ejected from the plane. Upon hitting the water, the cubes broke apart. Meyers and he retrieved as much of the marijuana as they could, returned to Meyer's house, whereupon the marijuana was off loaded.

8. Johnson further advised that Meyers and he were suppose to receive $100,000, for their services. He indicated that the marijuana which was stored in Meyers' Blue Hyundai was collateral for this payment. (*See* paragraph 6 above)

3

9. Johnson further advised that Pillock resided at 2400 NE 10th Court, Apartment 10, Pompano Beach, Florida.

10. After Johnson completed his statement, Detective Weiman proceeded to Pillock's alleged residence at 2400 NE 10th Court, Apartment 10, Pompano Beach, Florida. Outside of the apartment, Detective Weiman observed a 1989 Ford Club Wagon which was registered to Greg Pillock. Detective Weiman unleashed his drug detecting dog for the purpose of giving him an opportunity to run around, and the dog alerted to the presence of an odor of a controlled substance emanating from an Enterprise Rental Van, which was on the east end of Pillock's apartment complex.

11. On April 26, 2000, agents observed Greg Pillock, cleaning the 1989 Ford Club Wagon. They observed him place the refuse in a grey garbage bag which he threw in a dumpster. Agents approached the dumpster and observed the grey trash bag inside of it. It was the only item in the dumpster. They retrieved the bag and discovered what appeared to be marijuana residue. The substance field tested positive for the presence of THC.

12. Later that same afternoon, April 26, 2000, agents observe Pillock board an Enterprise Rental Van, the same van identified in paragraph 10. Pillock drove the van northbound on the Florida Turnpike.

13. A trooper from the Florida Highway Patrol stopped the vehicle. Detective Weiman approached Pillock, and began to identify himself and the reason for the stop; namely he was being arrested for possessing the marijuana which he cleaned out of his van and attempted to discard. (*See* paragraph 11) Pillock responded, "I know why." Pillock consented to a search of the van, whereupon approximately 330 pounds of what appeared to be marijuana was discovered.

4

The substance field tested positive for the presence of THC.

14. After being advised of his rights against self-incrimination, Pillock confessed that "LARRY" LONDON, a pilot, and he had been discussing an airdrop of marijuana. LONDON was employed as a pilot for UPS, in Swainsboro, Georgia. He was also a manager of the Emmanuel County Airport in Swainsboro, Georgia. LONDON agreed to pick up the marijuana from Jamaica, and drop it into the ocean for pick up. Pillock, however, needed to front the money for the operation. After Pillock found a financier, he contacted LONDON. LONDON advised Pillock to contact Tar Heel Aviation, the owner of a Cessna Caravan 208B Single Engine Plane, (the "Cessna") which it leased to UPS, and arrange for someone to sublease the plane. LONDON further advised Pillock that the subleasor should designate LONDON as the pilot. PILLOCK further stated that LONDON designated 80 degrees North by 24 to 26 degrees west as the coordinates where the marijuana would be dropped.

15. Pillock went on to state that on April 23, 2000, LONDON flew from Swainsboro Geogia to Fort Lauderdale. In Fort Lauderdale, he loaded his plane with certain items from Pillock's warehouse, and flew to Jamaica. On a Customs' Form which LONDON submitted, the stated purpose of his trip to Jamaica was to deliver electronic equipment. On the same day, LONDON flew back from Jamaica to Fort Lauderdale. At about 10:20 p.m., LONDON reached the designated coordinates, and radioed the boat. LONDON made contact with the boat, the boat flashed a Q-Beam at the airplane, and then an individual ejected the four cubes of marijuana. Pillock further advised that "BILLY" was in the plane with LONDON and was the individual who ejected the marijuana.

Pillock further advised that LONDON was expected to drop approximately 1900 pounds

5

of marijuana. Pillock was at Terrill Meyer's house when Meyers and Johnson returned from the pick up. They transferred the marijuana from Meyer's boat to Pillock's van, a 1989 Ford Club Wagon. They weighed the marijuana on a bathroom scale and it weighed approximately 1200 pounds. Accordingly, they were missing about 700 pounds of marijuana. Pillock advised that LONDON was suppose to receive approximately 350 pounds, Pillock was suppose to receive approximately 330 pounds and Meyers and Johnson were suppose to receive approximately $100,000.

Pillock stated that following the offload, he met with LONDON, "BILLY" (believed to be WILLIAM T. MOCCIA), Meyers and others at a Denny's restaurant located at North Federal Highway in Pompano Beach, Florida. They agreed that LONDON's cut of the marijuana would be removed from Pillock's van, and be given to another individual who would drive it to LONDON's ranch in Georgia.

16. On April 23, 2000, LAWRENCE LONDON completed a Custom's Form 5129, Crew Member's Declaration wherein LONDON declared that he had flown from Jamaica to Fort Lauderdale on that date, and had one other crew member on board, WILLIAM T. MOCCIA. The document reflects that LONDON went through the United States Customs Service in Fort Lauderdale airport at approximately 11:18 p.m., on April 23, 2000.

17. Agents checked the Global Positioning System on Terrill Meyer's boat, and the coordinates 80 degrees North by 24 to 26 degrees west were the last programmed coordinates.

18. Agents contacted Tar Heel Aviation. The General Manager, George Leaming advised that Tar Heel did in fact lease a Cessna Caravan 208 B Single Engine plane to UPS, and that it was common for that plane to be subleased for use when UPS was not in need of the plane.

6

He further advised that he received a letter dated April 7, 2000, from a Keith Wilson requesting to sublease the plane on the weekend of April 16, 2000, and requesting LONDON as the pilot. He further advised that a subleasing agreement was executed and that the plane was subleased for the weekend of April 22, 2000.

20. On or about April 27, 2000, the Cessna aircraft which LONDON had piloted was parked at the Emmanuel County Airport, in Swainsboro, Georgia. A dog trained to alert to the presence of the odor of controlled substances alerted to the Cessna Aircraft. LONDON was confronted by law enforcement officers. He admitted flying to Jamaica but denied knowledge of narcotics. He denied consent to search the Cessna.

**WHEREFORE**, I believe there is probable cause to believe that LAWRENCE LONDON and WILLIAM T. MOCCIA did knowingly and intentionally conspire to import into the United States, from a place outside thereof, a controlled substance, to wit: marijuana, in violation of Title 21, United States Code, Sections 952(a) and 963; did knowingly and intentionally conspire to posses with the intent to distribute a controlled substance, to wit: marijuana, in violation of Title 21, United States Code, Sections 841(a)(1) and 846; did knowingly and intentionally import into the United States, from a place outside thereof, a

7

controlled substance, to wit: marijuana, in violation of Title 21, United States Code, Section 952(a) and did knowingly and intentionally posses with the intent to distribute a controlled substance, to wit: marijuana, in violation of Title 21, United States Code, Section 841(a)(1).

**FURTHER AFFIANT SAYETH NAUGHT.**

THOMAS J. REDPATH, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn and subscribed before
me this 1st day of May, 2000.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

8